# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>SAMUEL CARSON, )<br>)<br>Defendant. )<br>) | Criminal No. 98-329-03 (RCL) |

## MEMORANDUM OPINION

Before the Court is defendant Samuel Carson's Motion for Discovery [1088]. Upon consideration of the Motion [1088], the government's Response thereto [1092], and the defendant's Reply [1094], defendant's motion will be DENIED IN PART and GRANTED IN PART.

### I. BACKGROUND

Samuel Carson was convicted in January 2002 for his participation in a vast narcotics conspiracy and related crimes. The United States Court of Appeals for the District of Columbia Circuit affirmed Carson's conviction and sentence and provided a lengthy account of the facts in its opinion. *United States v. Carson*, 455 F.3d 336 (2006). For purposes of the present motion, the Court will briefly highlight certain facts relevant to its opinion.

Carson was a lead participant in an "organized and massive business of selling drugs" in and around the 200 block of K Street, Southwest, in the District of Columbia. *Id.* at 339. Members of the K street drug network exhibited a "complete repudiation of civil society and respect for human life," as demonstrated by the network's murder of eleven people. *Id.* Samuel Carson was personally involved in nine of those murders. *Id.* at 341–42, 344–46. Naturally, this pattern of

murder and mayhem attracted the attention of law enforcement, and in late 1995, the Federal Bureau of Investigation ("FBI") began an investigation of illegal drug sales in the K Street area. *Id.* at 339.

In November 2006, Carson and his cohorts—James Montgomery and William Kyle Sweeney—murdered Melody Anderson, Alonzo Gaskins, and Darnell Mack in Prince George's County, Maryland. *Id.* at 344–45. The PG County State's Attorney's Office initiated a grand jury investigation of the triple murder and presented the testimony of Cheree Owens and her fiancé John Pinkney to the grand jury. *Id.* at 376. On December 10, 1996, Owens testified that two weeks following the murder, she overheard Dennis Green state that he, along with others, "just took three people out of the street." *Id.* Pinkney testified that after Owens told him about the conversation, he confronted Green, who became upset and threatened Pinkney and Owens. *Id.* at 377. As potential witnesses to a triple homicide, Owens and Pinkney were given a "considerable amount" of money to relocate, which they spent within a few days. *Id.* at 377–78. Investigators were ultimately unable to corroborate the information provided by Owens and Pinkney and came to "believe that [investigators were] being used by Pinkney and Owens." *Id.*

Meanwhile, the FBI's investigation of the K Street network continued. *Id.* at 377. On December 5, 1996, five days prior to the grand jury testimony of Owens and Pinkney in Maryland, the FBI arrested Robert Smith, "one of the main suppliers of marijuana" in the District. *Id.* at 346. During his initial detention, Smith agreed to act as an informant and told the FBI that the K street drug network was responsible for the triple murder. *Id.* at 360. Unlike the unsubstantiated grand jury testimony of Owens and Pinkney, Smith's information was corroborated by the recovery of Sweeney's fingerprint at the scene of the crime, Carson's own statements to a fellow inmate, and the testimony of James Montgomery—a cooperating member

2

of the K Street gang. *Id.* at 345 & n.7. Carson murdered Smith before he could testify at trial, but Smith's statements regarding the murder were admitted through law enforcement officers. *Id.* at 361–62.

As part of his defense, Carson sought to present Owens' and Pinkney's implication of Dennis Green in the triple murder, but neither the U.S. Marshall's Service nor defense investigators were able to locate the couple. *Id.* at 377. Consequently, Carson sought to introduce the transcript of Owens' and Pinkney's grand jury testimony pursuant to Federal Rule of Evidence 804(b)(1). *Id.* As an exception to the rule against hearsay, Rule 804(b)(1) permits the admission of prior sworn testimony of unavailable witnesses so long as it is "offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1).

The district court, Judge Thomas P. Jackson presiding, found that the United States and Maryland did not have an "identity of motive" in the state grand jury proceedings, and the testimony was therefore inadmissible. *Id.* at 378. The D.C. Circuit affirmed. *Id.* at 381. On the question whether the state and federal authorities had a "similar motive" as required by the Rule, the Circuit held that "the purpose of the Maryland prosecutors was to investigate a crime and identify possible criminals," not to prove Carson guilty of triple murder. Thus, no similar motive existed. *Id.* at 379.

The Circuit also found that, motives aside, the federal government had no opportunity to examine Owens and Pinkney given that Maryland and the United States are separate sovereigns. *Id.* at 380–81. Federal and state authorities could, the Circuit held, be considered as one sovereign for the purposes of Rule 804(b)(1) if the federal authorities controlled the actions of state investigators such that the state was "merely a tool" of federal authorities. *Id.* at 381.

3

Critically, "[e]xtensive law enforcement and prosecutorial cooperation between two sovereigns" is insufficient. *Id.*

In support of his argument to the D.C. Circuit on this issue, Carson offered only the trial testimony of FBI Special Agent Vincent Lisi that "we [the FBI] tried to keep them [the Prince George's County Police] involved. [Prince George's County's] primary focus was the triple murder. We tried to let them know everything we [had] on the triple murder." *Id.* The Circuit held that this fell "far short" of establishing federal control of the investigation and affirmed Carson's conviction and life sentence. *Id.*

On February 18, 2008, Carson filed a motion to vacate his sentence under 28 U.S.C. § 2255. Mot. to Vacate Sentence, ECF No. 1023. The defendant subsequently moved to consolidate his § 2255 motion with those of his co-defendants. Mot. to Join. Pets. Filed by Co-Defs., ECF No. 1024. In furtherance of his motion, Carson has now moved for discovery pursuant to Rule 6(a) of the Rules Governing Section 2255 Proceedings.

## II. LEGAL STANDARD

Habeas petitioners are not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). But under Rule 6(a) of the Rules Governing Section 2255 Proceedings, this Court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09. The regulation of discovery in habeas cases is "a matter confided to the discretion of the District Court." *Id.* at 909.

4

## III. ANALYSIS

Carson's motion requests discovery of "any and all documents relating to the triple murder investigation by the FBI, DEA, and PG County Police Department." Def.'s Mot. for Discovery 3, ECF No. 1088. Specifically, Carson requests eight categories of discovery, including (1) any cooperation agreements and payment records between the government and Owens and Pinkney; (2) any documents relating to the dismissal of the triple murder investigation in Maryland or documents stating the official reason for federal, as opposed to state, prosecution; (3) all transcripts of Agent Lisi's grand jury testimony; (4) transcripts of testimony of all federal agents in the Maryland grand jury; (5) all federal or state investigation reports regarding the triple murder or the existence of Owens and Pinkney; (6) any investigation reports regarding the whereabouts of Owens and Pinkney or stating official reasons for declining to prosecute Owens and Pinkney for perjury and obstruction of justice; (7) any formal or informal agreements between the state and federal governments regarding dismissal of charges in Maryland in favor of federal indictment; and (8) copies of the original trial exhibits and the government's official exhibit list. *Id.* at 3–4.

The basis for this expansive discovery request is a Washington Post article dated November 22, 1996, reporting that "agents from the FBI and the Drug Enforcement Administration [had] joined the probe" into the triple murder. Notably, this article adds nothing to what was already known from Agent Lisi's testimony at trial—that federal and state authorities worked together to solve the triple homicide. Yet, from this "new" information, the defendant surmises that there was a "deep connection" between the federal and state investigators that was heretofore unknown to defense counsel. It is not entirely clear whether Carson seeks discovery on this "deep connection" to mount an attack on the Circuit's holding on the inadmissibility of Owens' and Pinkney's grand jury testimony, to establish discovery violations by the prosecution, or both.

5

To the extent that Carson seeks to re-litigate the Circuit's decision, his motion is denied. *See United States v. Greene*, 834 F.2d 1067, 1073 (D.C. Cir. 1987) ("We hold, therefore, that the issue now raised by [defendant] was decided by this court on direct review, and that collateral attack is inappropriate.").[1]

It is also unclear precisely what discovery violations Carson alleges. The Court will therefore examine the government's discovery obligations generally.

### A. Alleged Discovery Violations

A federal prosecutor's discovery obligations arise primarily from four sources. First, the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), requires disclosure of evidence favorable to the accused that is material to guilt or punishment. "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Second, in *Giglio v. United States*, the Supreme Court held that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence' . . . evidence affecting credibility" must be disclosed. 405 U.S. 150, 154 (1972). Third, the Jencks Act requires the government, after a witness has testified on direct examination, "to produce any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500. Finally, Rule 16 of Federal Rules of Criminal Procedure requires production of the defendant's statements and criminal history, documents or objects material to the defense or used by the government in its case-in-chief, and certain reports of examinations and tests. The question

---

[1] Aside from the impropriety of revisiting an issue already decided on direct appeal, this Court finds that even if Carson could establish this "deep connection," Owens' and Pinkney's testimony would still be inadmissible. The Circuit made clear that extensive cooperation between two sovereigns is insufficient. *Carson*, 455 F.3d at 381. Rather, there must be control so extensive that one sovereign is merely a tool for the other, and there is absolutely no indication of such control here.

before this Court is whether Carson has established good cause to believe that the discovery he seeks will establish a violation of these rules that entitles him to relief.

Many of Carson's requests concern Owens and Pinkney. It is clear from the Circuit opinion that the government met its *Brady* obligations by disclosing to trial counsel (1) Owens' and Pinkney's testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and Pinkney; and (3) the fact that Pinkney and Owens absconded with the government's money. Had the pair actually testified at trial, further disclosure of *Giglio* and Jencks material would have been required, including any prior statements and any cooperation agreements between the government and the two witnesses. But despite the best efforts of the government and defense counsel, the pair could not be located and did not testify. Thus, Carson has failed to establish that—even if there are undisclosed agreements or documents involving Owens and Pinkney—he is entitled to relief. Discovery of the first, fifth, and sixth categories of Carson's request is therefore denied.

Carson next requests complete disclosure of all federal and state investigative reports regarding the triple murder. This request is easily disposed of as there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *United States v. Agurs*, 427 U.S. 97, 109 (1976). Moreover, the Supreme Court has rejected "complete discovery of [a prosecutor's] files as a matter of routine practice" and held that the government has "no duty to report . . . to the defendant all that they learn about the case and about their witnesses." *Id.* at 109 (quoting *In re Imbler*, 387 P.2d 6, 14 (Cal. 1963)). Similarly, Carson's request for transcripts of the grand jury testimony of *all* law enforcement agents is overbroad and lacks any statutory or constitutional basis—the government is required only to turn over previous grand jury testimony for witnesses

7

*that testify at trial.* Accordingly, discovery of the fourth and fifth categories of Carson's request is denied.

Carson also seeks to discover the state and federal government rationale for seeking federal, as opposed to state, prosecution of Carson and for declining to prosecute Owens and Pinkney for perjury or obstruction of justice. Such material is outside the proper scope of discovery. In our legal system, "the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). "This broad discretion . . . is particularly ill-suited to judicial review," *Wayte v. United States*, 470 U.S. 598, 607–08 (1985), and is certainly not subject to carte blanche review by criminal defendants. As such, discovery of the second, sixth, and seventh categories of Carson's request is denied.

In sum, Carson has failed to establish good cause for his discovery requests because he has no constitutional or statutory right to the discovery he seeks. Although Carson has speculated—based solely upon the trial testimony of Special Agent Lisi and a Washington Post article—that the government is hiding volumes of discoverable material, provided "pay off money to make [Owens and Pinkney] disappear," and failed to pursue the real perpetrators of the triple homicide, *see* Def.'s Reply 1, ECF No. 1094, this Court cannot order expansive discovery based on such unfounded allegations. *See Strickler*, 527 U.S. at 286 ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.").[2]

---

[2] An additional reason to deny Carson's discovery request is that he has procedurally defaulted on his discovery claims. *See, e.g., United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008) ("Because [habeas petitioner] did not raise his . . . claim on direct appeal, the procedural default rule bars its consideration unless . . . [petitioner] demonstrates cause and prejudice."). Carson does not identify *specific* material that was withheld by the government, which would provide sufficient cause to excuse his default, *see, e.g., Strickler*, 527 U.S. at 282–84, but identifies only an article that fuels speculation that the government *may have* improperly withheld discoverable

## B. Agent Lisi's Grand Jury Testimony & Trial Exhibits

Special Agent Vincent Lisi testified on different occasions throughout Carson's trial. Carson requests copies of Agent Lisi's grand jury testimony regarding the activities of the K Street network, presumably as *Giglio* or Jencks material. As trial counsel impeached Agent Lisi with his grand jury testimony repeatedly during cross examination at trial, it is clear that these transcripts were produced in discovery. *See, e.g.*, Tr. of Trial, January 22, 2001, ECF No. 939. Habeas counsel avers that despite her best efforts to locate the transcripts, she has been unable to obtain copies of Agent Lisi's grand jury testimony. Accordingly, the Court will order, to the extent possible, that the government produce to defendant's habeas counsel any copies of Agent Lisi's grand jury transcripts that were previously produced in discovery.

The final category of discovery requested by Carson consists of the trial exhibits and the government's trial exhibit list. The government indicates that it does not object to this request and has indeed been working to make these items available to the defendant. The Court will therefore grant defendant's discovery request as to the trial exhibits and exhibit list.

A separate Order consistent with this Memorandum Opinion shall issue this date.

9/23/13

ROYCE C. LAMBERTH
United States District Judge

---

material. This article was published in the Washington Post 24 years ago, yet the defendant failed to raise his concerns either at trial or on direct appeal.